1

# THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF VIRGINIA

FILED

AUG 2 0 2021

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| Delvin Lamar Baldwin | ( |
| | ( |
| Plaintiff, | ( |
| | ( COMPLAINT 2:21cv479 |
| v. | ( |
| | ( |
| United States of America | ( |
| | ( |
| Defendant, | ( |

1. Plaintiff brings this complaint against the United States of America pursuant to the <u>Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 (b).</u>

2. Plaintiff has exhausted his claims by filing the required forms with the Defendant and having his claims denied, <u>*See*</u> Ex. (1) [SF-*95,* Administrative Complaint]; Ex (s). (2,3) [July 2020 Denial Letter, & Feb 2021 Denial Letter]

I.    Introduction

3. This action seeks damages for "Delvin L. Baldwin" ("Baldwin") Plaintiff in the above-style matter unconstitutional removal from Federal Employment; Defendant, the United States of America, breached its duty of care owed to Plaintiff when the Federal Government terminated Plaintiff's employment with the Civil Service based upon erroneous interpretation of Plaintiff's

1

2

urinalysis results, conducted by the Tortfeasor's third party "Abbot", ( Formerly "Pembrooke

Employment Screening Solutions), Richmond Virginia ; in which Plaintiff's specimen tested

positive for ("3016") nanograms of "Codeine", *See* Ex. (16), [Custody Control Form, Copy 1] a

legal substance, during a random drug screening conducted by Defense Logistics Agency

("DLA"), a component of the Department of Defense ("DOD"),  located at 8000 Jefferson Davis

Hwy, Richmond Virginia, 23297.

4. In addition to Baldwin removal due to an erroneous interpretation of his urinalysis results, the

Agency furthered its willful negligent actions when Mark Harvey, Plaintiff former operations

supervisor, along with Ben Harvey, Deputy Director, and John Pearson, Director; the three

Federal Employees breached its duty of care owed to the Plaintiff, when the Federal employees

failed to adhere to a specific "mandatory" D.O.D. statutory policy, which in pertinent part

provides:

> *upon an <u>initial</u> positive finding of a control substance reported by a Medical*
> *Review Officer, mandates the Agency direct Baldwin in writing to counseling,*
> *treatment, and or rehabilitation, to include the consequences of refusal; and upon*
> *completing a successful treatment program, the employee will return to full duty*
> *status.*

5. In concert with Plaintiff unlawful removal, also gave rise to what can only be described as a

("procedural conspiracy"), initiated by the aforementioned Federal Employees with

coconspirators, The American Federation of Government Employees, ("AFGE"); union members

(Monique Samuels) "President" Local Lodge 1992 Richmond Virginia, and (Quinton Montague)

"Vice President".

6. Samuels and Montague pivotal part in the scheme, falsely asserted the "Union" sincerely

represented Baldwin, a due's paying member of the Union, in an adverse personnel action

("proposed removal") covered under <u>Title 5 U.S.C. 7512 sub-chapter</u> (1). Although

3

disingenuous, the representation was in accords with the Master Labor Agreement ("MLA")

between DLA and AFGE. The scheme divests the Merit Systems Protection Board ("MSPB") of

Jurisdiction over Plaintiff's appeal, thereby insulating the Government meritless charge of

misconduct from judicial scrutiny; an "end-around" Plaintiff Constitutional Protections.

## II.    Defense Logistics Agency Civilian Drug Testing Procedures

7. Executive Order 12564 § (4), sub-part (d), in pertinent part states:

> *"The Secretary of Health and Human Services is authorized to promulgate scientific and technical guidelines for drug testing programs, and agencies shall conduct their drug testing programs in accordance with the guidelines once promulgated"*
> see, https://www.archive.gov/federalregister/codification/executive-order/12564.html:

8. On October 17, 2017, Health and Human Services ("H.H.S.") promulgated "Substance Abuse

and Mental Health Services Administration Center for Substance Abuse Prevention; Medical

Review Officer Guidance Manual for Federal Drug Testing Programs, Ex. (4) ["SAMHSA"].

9. "DLA" incorporated and adopted Executive Order 12564 § (4) into its current drug testing

procedures, *See* Ex. (5) Defense Logistics Agency Policy and Instructions [ "DLAI 1010.09"] to

include the Secretary of ("HHS") scientific and technical guidelines for drug testing programs

Ex. (4) SAMHSA, *See* DLAI 1010.09 enc. (3) ref. (j), which encompass statutory language that

specifically applied to Plaintiff urinalysis results.

10. Although having comprehensive drug testing programs and procedural policies established,

nevertheless the Federal Employees nefariously charged Plaintiff with "illegal drug use", and the

appearance of "submission of inaccurate medical documentation", in which the two charges of

misconduct are inextricably intertwined.

11. Meaning, the Agency second charge against Plaintiff, is totally dependent upon the Defendant

substantiating Baldwin engaged in illegal drug use before a judicial inquiry; thus, the so called

"appearance" of submitting inaccurate medical documentation, is not independent of Plaintiff

3

alleged violation of the Agency Civilian Drug Testing Policy, thus is irrelevant in any judicial proceedings.

12. The compounded drug ("Acetaminophen/Cod#3",) its generic name, commonly known as ("Tylenol 3") is a legal substance, due to its accepted medical usage, *See* https://www.therecoveryvillage.com also *See* Title 21 of The Control Substance Act ("CSA"); in addition, the drug was from a legitimate source.

13. Although Defendant Drug testing policy does not encompass zero tolerance language, however, Defendant declared the mere microscopic presence of "Acetaminophen/Cod #3, detected in Plaintiff's test specimen, as illegal drug use; irrespective of "SAMHSA" mandatory criteria determines the quantitative level and drug classification fell well outside the parameters of H.H.S. confirmation and verification protocols, relevant to positive results reported from the lab to the MRO.

14. The miniscule amount of 3016 nanograms of Codeine, equivalency to ("one billionth of a gram"), detected in Plaintiff system during testing, along with its Scheduled III Classification, did not at any time expose employees of the Agency to a potential safety hazard, neither did the quantitative level meet Health and Human Services criteria for positive verification reporting by a Medical Review Officer ("MRO"), *see* Ex. (4) § 5.4.1 pg. (58).

15. Even more-so, Defendant also considered Plaintiff was not a safety risk, by allowing Plaintiff to remained in his leadership position as Materials Handler Leader, successfully performing assigned duties, well after the Government was notified by the Drug Testing Program Manager ("DPM"), Candance Meckley on Sept. 19, 2018, of Plaintiff's positive results. Plaintiff was not removed from Federal Service until March 1, 2019, some six-months after the positive reporting.

III. Tortfeasor third-party Abbot (eScreen) Breached its Duty of Care Owed to Plaintiff ...

5

16. The elements of a cause of action sounding in negligence are the existence of a duty, breach of that duty, a legally attributable casual connection between the negligent conduct and some injury, and some damage to the Plaintiff's legally protected interest, *See* Pornomo v. United States, 814 F. 3d 681, 687 (4th Cir 2016). The legally protected interest here, is Plaintiff's Employment with the United States Government.

*17.* In accordance with Code of Virginia Tort Law, Title 8.01, Civil Remedies, et. Seq. 34 "negligence" is defined as a "breach of a legal duty owed by one person to another". In common dialect, this is often described as the failure to use ordinary care, *See C.D.* Kenny Co. v. Dennis, 167 Va. 417, 420 (1937).

18. Relevant to the instant matter, the South Carolina Supreme Court held that laboratories who perform workplace drug tests on behalf of employers owe a duty of care to the individuals who are tested and may be sued for negligence for failing to perform the drug tests and report the results; *See* Wilmot Shaw, Plaintiff v. Psychemedics Corporation, Defendant Appellate Case No. 2017-002538 (March 20, 2019)

19. Plaintiff here, a ("private citizen",) claims are not against the Department of the Army Forensic Drug Testing Laboratory responsible for analyzing and reporting Plaintiff's test specimen to the MRO, rather a claim against the "Tortfeasor's" federal contractor Abbot, and its gross negligence in the erroneous interpretation of Plaintiff's urinalysis results reported to the MRO by ("FDTL").

20. In accordance with procedural due process, SAMHSA entire publication may not be legally enforceable, however; regarding the Claimant, the guidance manual reference specific statutory protocols the MRO was required to follow but failed to do so, *See* Ex. (4) SAMHSA, Ch. (1) Intr. par. (1) at pg. (7); in accords with Executive Order 12564 dated September 15, 1986, section 503 of Public Law 100-71, 5 U.S.C. section 7301.

21. In accordance with the Agency "Drug Testing Procedures, Ex. (5), states

6

> *"When the laboratory receives a confirmed positive result, the Medical Review Officer ("MRO") shall perform the duties set forth in Health and Human Services Guidance Manual,"*

*See* Ex. (5), DLAI1010.09, § (4), Enc. (3) sub-par. (b) at pg. (10).

22. The principal purpose of the federal contract between Abbot eScreen located at 9201 Arboretum Pkwy (Suite 200), Richmond Virginia, 23236; and the Defense Logistics Agency, required the Federal Contracted MRO to confirmed, verify and accurately interpret positive results from the Department of the Army Forensic Toxicology Drug Testing Laboratory, Fort George Mead, Maryland, See Ex. (5) Enc. (3), to include interviewing donors who tested positive for Opioids, to ascertain whether there is clinical evidence of drug abuse, in accordance with HHS Additional Mandatory Guidelines, Ex. (4) SAMHSA, § (5) (4) (1), (Morphine and Codeine), par. (s) 3, 6 pg. (58).

23. HHS mandatory guidelines without ambiguity, and self-interpretations, identifies specimens containing an Opium derivative, "codeine" with concentration levels "<u>more</u>" than or "<u>equal</u>" to ("15000 n/g") requires the donor to present to the MRO a legitimate medical explanation for concentration levels equaling to or surpassing 15,000 n/g, *e.g.* (a valid prescription) Ex. (4), SAMHSA, § (5) (4) (1), 5-6, pg. (58).

24. In respects to Plaintiff's test specimen, after a request from the donor to Abbot requesting unredacted quantitative levels, *See* Ex. (23), [ "Request for unredacted urinalysis results"], the Army Testing Laboratory, with specificity, list Plaintiff quantitative level of codeine at ("3016 n/g"), far less than H.H.S. criterion of 15,000 n/g. which triggers the requirement of a valid medical prescription to justify such a large concentration of the drug, *See* Ex. (16), (Custody Control Form "Copy 1").

7

25. In addition to its concentration level, due to the complexity of accurate reporting, H.H.S. required the MRO to determine the control substance drug class, providing:

> *"The Opioid Drug Class poses some unique challenges with regard to interpretation because a positive result may be from a legitimate source including a positive result for any of the opioid analytes (with the exception of 6 AM) maybe from legitimate use of a drug product*

Ex. (4) SAMHSA, (5) (4) (1) par. (1). Pursuant to Ch. 7.1 Drug Classes, par. (3), pg. (83); Plaintiff test specimen containing codeine was also combined with a weak analgesic ("acetaminophen"), according to SAMHSA, the control substance found in Plaintiff's test specimen is identified as a "Schedule III compound".

26. Ex. (4), SAMHSA, (5) (4) (1), sub-par. (4) pg. (58) only exemplifies Schedule I or II control substances containing codeine or morphine listed in the Control Substance Act (CSA) required the MRO to initiate the confirmation and verification process; and if the concentration levels were equal to or greater than 15,000 n/g required a valid prescription.

27. Plaintiff test specimen with a concentration level of 3016 n/g and listed in the Schedule III drug category, was outside the purview of the MRO confirmation and verification process; in which statutory language required the MRO to record Plaintiff's positive findings of 3016 n/g of codeine as negative without the presentation of a valid prescription, or a medical explanation, *See* Ex. (4) H.H.S, positive reporting criteria, § 5-6 pg. (58).

28. The errant interpretation is precisely due to Dr. Fierro failure to ascertain mandatory critical quantifiable data as directed by H.H.S. prior to reporting positive results to the donor's employer. Consequently, Abbot Medical Review Officer, Dr. Robert Fierro undisputedly breached its "duty of care" owed to the Plaintiff by failing to adhere to mandatory protocols, and

8

reporting erroneous test results to Baldwin's employer, the Defense Logistics Agency, which Dr.

Fierro flawed reporting in large part caused Plaintiff's unlawful removal.

III     Defense Logistics Agency Gross Negligence & Breached Duty of Care Owed to Plaintiff

29. Reiterating, Plaintiff's former employer "DLA" do <u>not</u> have a "zero tolerance" drug testing

    policy. Quite to the contrary, a comprehensive procedural protocol incorporated in Ex. (5),

    "DLAI1010.09", which encompasses "mandatory rehabilitation for first time individuals with

    positive urinalysis results", *See* Ex. (5), Enc. (3) par. (5) sub-section (C), pg. (10). Mandatory

    referral is also written in two separate Memorandums issued to Plaintiff, Ex. (24) [ "Notice of

    Selection for Random Testing Under the DLA Civilian Employee Drug Testing Program"] par.

    (7), and Ex. (25) [ Notice for Selection into Testing Designated Positions"] par. (6).

30. In accordance with regulatory protocols, on September 19, 2018", Defense Logistics Agency

    Drug Testing Program Manager "Candace Meckley" ("DPM") issued to recipient Mark Harvey

    Ex. (19), a ["Memorandum for Supervisor of Delvin Baldwin – DDRV"] of pertinent part, the

    memorandum expressly instructed Plaintiff's Operational Supervisor with the following

    mandatory requirement:

> *"Employees who are found to use illegal drugs must be referred to the Employee*
> *Assistance Program for Counseling and referral for rehabilitation. Employees in*
> *testing designated positions who test positive must be removed from their*
> *positions, through detail, reassignment, or other action, until their rehabilitation*
> *is complete". "Referral to the EAP will be in writing and will inform the employee*
> *of the consequences of refusal of counseling and/or rehabilitation".*

31. Upon receipt of this notice, from the outset M. Harvey, absent of any superseding vested

    discretionary authority from any rule or regulation, that contravenes Plaintiff's right to

    "procedural due process", the Government Employee violated explicit mandatory instructions,

    by issuing to Plaintiff Ex. (20), a ["Memorandum of Proposed Removal"] from Federal Service,

9

rather than mandatorily directing Plaintiff to the Employee Assistance Program for counseling and rehabilitation in writing, to include the consequences of not participating in the mandatory program per Agency regulations.

32. The removal proposal in and of itself illustrates the Agency Employee, exercised a discretionary function prohibited by law, *See* U.S. Const. Fifth Amend., in concert with a violation of the Agency own procedural language.

33. Pursuant to pre-deprivation procedures, M. Harvey proposed removal was subsequently transferred to B. Harvey, who simply endorsed M. Harvey unlawful removal proposal, issued to Plaintiff Ex. (21), a ["Decision to Remove Memorandum"]; Of pertinent part, the Deputy Director stated,

> *"I have decided to remove you from Federal Service, effective February* 3, 2019 *"I believe that your potential for rehabilitation is limited in your case".*

34. The Agency drug testing protocols does not vest discretion to Ben Harvey to substitute his personal belief, over procedural policy, thus is a direct violation to a standing Agency statutory procedure; employees who tested positive for the <u>first time</u>, for a control substance during a random urinalysis screening, mandates referral by management in writing, to the EAP for rehabilitation.

35. Finally, B. Harvey decision to remove memorandum was transferred to John Pearson, Director, and the final authority, who in-turned issued to Plaintiff Ex. (22) ["Memorandum for Delvin Baldwin "Formal Grievance Response"]. Pearson upheld B. Harvey decision to remove Baldwin which in pertinent part the Director attempting to rationalize his errant decision: "You have not provided anything to the contrary that proves that this positive finding of codeine in your system was from a valid prescription issued to you by a health care practitioner".

36. In concert with a blatant misreading of Ex. (4) SAMHSA § 5.4.1 statutory language, there is nothing in the Memorandum that remotely suggest, Pearson directed, or instructed Plaintiff to seek counseling from the EAP and the consequence if he failed to do so, pursuant to the Agency Drug Testing Policy.

37. The circumstances in which Ex. (5), DLAI1010.09 specifically refers to which removal is at the discretion of the Agency, is clearly specified in policy:

    (1) *Refusing to get counseling or rehabilitation or refusing to comply with all aspects of the recommended EAP course of action required in reference c. (2). Not reframing from illegal drug use after a first finding of illegal drug use.*

    *See* Ex., (5) [ DLA1010.09] par. (j) sub-section (a) & (b), pg. (11). Neither circumstance was applicable to Plaintiff.

38. The Supreme Court has held that federal employment is Constitutionally protected property, meaning that it cannot be taken away without due process, *See* https://federalnewsnetworkcom . The U. S. Supreme Court also explained that "due process, unlike some legal rules, is not a technical conception with fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protection as the particular situation demands"; Gilbert v. Homar, 520 U.S. 924, 131-32 (1997)

39. The Federal employees here, malevolently advocated a baseless claim, Plaintiff has an addiction to illegal drugs, based solely upon a microscopic finding of a legal substance with a legitimate purpose, ("to suppress severe back and neck aches") in which H.H.S. criterion determined the quantitative level in plaintiff's system was of legal use without the requirement of a prescription.

40. By illegally removing Plaintiff from Federal Service, the Government deprived the Undersigned of his health benefits, retirement, annual income, all benefits in connection with privileges of employment, absent of procedural due process in respects to random drug testing.

11

41. Defendant furthered its injuries to the Plaintiff by negligently recording <u>illegal drug use</u> upon Baldwin's Standard Form 50; ["SF-50"] Ex. (7), as a result, the Undersigned cannot obtain future Federal Employment. Consequently, Plaintiff became homeless, suffers from anxiety attacks, and severe depression.

42. The named federal employees who errantly removed Plaintiff were acting within the scope of their office or employment under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the laws of the State of Virginia, *See* 28 U.S.C. § 1346 (b).

43. Plaintiff, a former employee, and preference eligible veteran of the Agency, with fifteen years of civil & military service, maintained an exemplary employment record, with no previous occurrences of illegal drug use or any other misconduct prior to his unconstitutional removal on March 1, 2019.

IV.    <u>Defendants Procedural Conspiracy & Plaintiffs Exhaustion of Remedies under the Civil Service Reform Act ("MSPB")</u>

44. The Department of the Army asserts in its second denial letter to Plaintiff, the CSRA was the exclusive remedy for Plaintiff's injury, therefore his claims under the FTCA are "non-compensable", *See* Ex. (3), [Feb. denial letter]. Considering the denial was based solely upon the Army's non-compensable theory, thus, a reasonable disinterested individual given all the facts, would conclude if not for Baldwin's former status with the U.S. Government, his injury claims under the FTCA are otherwise valid.

45. Consequently, the following facts and authorities refutes the Army CSRA exclusive remedy response, Ex. (3), and not an attempt by the Plaintiff to relitigate proper venue before this court; rather to present facts and authorities, that the Tortfeasor and its Federal Contractor Abbot, breached its duty of care owed to the Plaintiff, by committing harmful "statutory" procedural

12

errors. and to show cause why such procedural errors were not examined by the courts prior to this action.

46. Although the Army provided several precedential cases in support of its reason for its denial, however, neither case concern former federal employees who were similarly situated to Plaintiff breach of duty claim. In addition, there is no language found in the FTCA or the CSRA that support the Army's contention that Baldwin's former employment with the U.S Government, precludes future FTCA claims, Ex. (3), par. (1).

47. Considering the Fifth Amendment requires the government to observe certain procedures when depriving individual of life, liberty, or property, *See* U.S. Const, Amend. V. Accordingly, Chapter 75 of Title 5 of the U.S. Code provides:

> *"Agencies may only take an adverse action against an employee "for such cause as will promote the efficiency of the service". In order to sustain an agency's decision on appeal to the MSPB, an agency must show (1) by a preponderance of the evidence that the charged conduct occurred; (2) a nexus between that conduct and the efficiency of the service; and (3) that the penalty imposed by the agency is reasonable",*

> *See* "The Civil Service Reform Act: Due Process and Misconduct-Related Adverse Actions (March 29, 2019)."

48. In consequence to Federal Employees Constitutional protections relevant to adverse employment decisions,  in concert with a pleather of evidence depicting clear harmful procedural errors committed by the Agency, i.e. (Ben Harvey, Mark Harvey, and John Pearson,  overt violation of the Agency drug testing procedures), and, Dr. Fierro of Abbot, (failure to follow specific mandatory procedures outlined in SAMHSA, Ex. (4)) clearly establishes the Agency

13

would have been incapable of meeting its burden to substantiate its meritless charges of illegal drug use against the Undersigned.

49. The Agency knowingly unable to meet its burden in the former or current, and in order to maliciously effect Plaintiff's removal, surrendered to conspiring with AFGE Officials in efforts to insulate its wayward charges of illegal drug use against Plaintiff from judicial scrutiny as described above.

50. In viewing the chronological actions by the Defendant, Baldwin removal was schedule for Sunday, Feb. 3, 2019, *See* Ex. (21) [Decision to Remove] par. (1), and Plaintiff had not filed a grievance as of Feb 1, 2019, as a consequence, the Plaintiff had not filed a grievance, Pearson on his own accord, emailed Montague on or around February 1, 2019, and inquired whether or not Plaintiff plans to file a grievance. Shortly thereafter Montague advanced a so called ["grievance request"] Ex. (18); to the Agency, without Baldwin consent or knowledge prior to its submittance, *See* Ex. (27)

[ "Baldwin v. MSPB, Response to Reply Brief"], par. (2) pg.(s) (1), (2).

51. Pearson, the Managing Director of Mapping Operations for DLA Richmond Virginia, with extensive experience relevant to the MLA negotiated grievance procedure, therefore knew or should have known the absence of a filed grievance is equivalent to an employee choosing not to file a grievance, hence the answer to his question was evidently clear.

52. There is nothing in the record Plaintiff ever communicated with any member of management referencing contemplation of filing a grievance, which would have prevented Pearson from removing Baldwin from service on Feb 1, 2019.

53. Thus, the Director's query had an alternative motive, to persuade Montague to submit the previously mentioned "grievance request", in which the AFGE official subsequently obliged Pearson request. Shortly thereafter Plaintiff was removed from Federal Employment.

14

54. Subsequent to Plaintiff's removal on March 1, 2019, there is nothing in the record, AFGE officials submitted any correspondences to the Agency, or Plaintiff, beyond its dishonest claims the Union intent to seek arbitration of Plaintiff's removal.

55. The intent to arbitrate email to Pearson from Montague on March 27, 2019, was just that an "intent" comparable to "no action", a hollow communiqué, in furtherance of AFGE deceitful participation in Plaintiff's dismissal.

56. Understanding, Federal Employees have two relevant options after their removal, file a grievance under the Master Labor Agreement ("MLA") negotiated grievance procedure, or an appeal to the Board, *See* 5 U.S.C. § 7121 (e) (1). Once an election is made by appeal or grievance, said choice is binding.

57. On March 30th, 2019, Plaintiff, believing he had not made an election, petition the Merit Systems Protection Board to redress his unlawful removal. Shortly thereafter, the Agency filed a motion to dismiss said petition, based on the premise Petitioner had previously filed a grievance challenging his removal by way of the negotiated grievance procedure. Despite Plaintiff vehemently arguing against Defendant's motion to dismiss, MSPB nevertheless ruled in favor of the Agency, *See* Ex. (8), (Delvin Lamar Baldwin Appellant, v. Department of Defense, Agency, DC-0752-19-400-I-1, (May 2019)).

58. On March 5, 2020, the U.S. Court of Appeals for the Federal Circuit, affirmed MSPB dismissal for lack of jurisdiction, *See* Ex. (9); (Delvin Lamar Baldwin, Petitioner vs, Merit Systems Protection Board, Respondent, 2019-2218; (March 5, 2020)).

59. Although the CSRA provided Baldwin with a forum ("MSPB") in which plaintiff diligently attempted to redress his injuries, and seek a remedy for such, however; the Agency interference with Plaintiffs constitutional remedy, by colluding with AFGE members to falsely assert the

15

Union represented the Plaintiff, when in fact there were no meaningful commitment by any
AFGE official to proffer a scintilla of an argument against Baldwin proposed removal.

60. After Plaintiff's termination on March 1, 2019, Baldwin submitted numerous correspondences
via email, to AFGE seeking the reason his removal was not advance to arbitration, if in fact the
Union provided Baldwin with representation. Plaintiff never received a response from Samuels
or Montague.

61. After filing the March 30, 2019, petition, on April 4, 2019, Montague contacted the Plaintiff via
email, and stated, he had spoken with Stephen Dade ("Counsel") representing DLA in Baldwin's
appeal and inquired whether Plaintiff wishes to pursue an appeal or Arbitration, *See* Ex. (14)
[emailed from Montague]. Montague pattern of ex parte communications with DLA principal
personnel, e.g. ("John Pearson, Stephen Dade") establishes AFGE complicit role in Baldwin's
removal.

62. Questioning whether or not Plaintiff intends to pursue an appeal or arbitration, some seven-
months after the proposed removal, and thirty-days after Baldwin's termination, the grievance
filed by Montague himself, the AFGE official knew or should have known the filing of a formal
grievance, predicates the arbitration process. Thus, there was no legitimate basis for the
question, other than to record Baldwin's response and convey said response to DLA Counsel
Stephen Dade, in the event Plaintiff affirmed arbitration.

63. Since Baldwin did not communicate, he intends to pursue arbitration, which would have made
Attorney Stephen Dade jurisdictional argument against Baldwin's appeal much simpler, and
virtually impenetrable, Pearson submitted a ["Declaration"] Ex. (26), attesting he witness
Plaintiff participation in a so called "grievance meeting".

16

64. The questionable grievance was undisputedly proffered by AFGE to divest the MSPB of its jurisdiction over Plaintiff's appeal, and not to provide Baldwin with representation, as the record will clearly show.

65. In addition, On March 9, 2020, Baldwin emailed Dan Doyle ("National Vice President of AFGE"), requesting AFGE to reinstate his grievance and arbitrate his removal, and to inform the VP of the bad-faith representation or the absent thereof, of Samuels and Montague, *See* Ex. (10) [email to Dan Doyle].

66. March 16, 2020, through his administrative assistant Patty Leonard, AFGE responded the Union had spoken with President Samuels, who stated the Union provided Baldwin with adequate representation, *See* Ex. (11) ["emailed from Patty Leonard"] and that District 4 will take no further action relevant to Plaintiff unlawful removal, and all future correspondences should be directed to Local 1992.

67. On March 16, 2020, Plaintiff emailed Montague and requested AFGE bylaws relevant to arbitration, ***See*** Ex. (12) [email to Montague], however, there were no response from Montague. In addition, there is no record an alleged "vote to arbitrate" ever materialize.

68. On March 29, 2020, Plaintiff submitted a second email to both Samuels and Montague inquiring as to why AFGE did not submit Plaintiff's removal to arbitration, *See.* Ex. (15) [Email to Samuels and Montague] neither AFGE official provided a response.

69. Viewing the totality of the abovementioned facts, it is unequivocally clear, AFGE by submitting a fictitious grievance, illustrates the Union participated in the unlawful removal of the Undersigned rather than providing representation.

70. Even if not for the Defendant and its co-conspirators AFGE officials, Montague, and Samuel's interference with Plaintiffs right to seek a remedy with respect to the Merit Systems Protection Board, by filing a false document disguised under the Negotiated Grievance Procedure as a

17

grievance, this court jurisdiction over this claim against the United States for money damages is soundly set-forth in 28 U.S.C. § 1346 (b) (1). The acts or omissions giving rise to the claim occurred in the Commonwealth of Virginia. Venue is therefore proper under 28 U.S.C. § 1402 (b).

V.     The Discretionary Function Exception does not apply to Plaintiff's FTCA Claim

71. Constitutionally, the Agency negligently deviated from its own regulations, by treating its Drug Testing Procedures as a mere internal guide in efforts to channel discretion. However, as a consequence to Plaintiff constitutional protection against "unjust removals" the Agency Drug Testing Policy is characterized as procedural and the substantive scope of the Agency action is constricted by statute, thus the Agency blatant departure from procedural rule which produces a harmful procedural error, as is the case here, is not beyond the judicial pale, *See* United States v. Caceres, 440 U.S. 741, 754 n.18 (1979).

72. Conduct of federal employees is generally held to be discretionary unless a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, ("Government employees act with discretion unless they are following a regulation or policy that is 'mandatory and . . . clearly and specifically define[s] what the employees are supposed to do.' (quoting C.R.S. ex rel. D.B.S. v. United States, 11 F.3d 791, 799 (8th Cir. 1993))). 179 Berkovitz, 486 U.S. at 536. j

73. Here in the instant matter, the exhibits presented before this court, e.g. Ex. (4); ["SAMHSA", Health and Human Services Mandatory Guidelines for Medical Review Officers] Ex. (5); [DLAI1010.09, Agency Drug Testing Policy] Ex. (19), [Memorandum for the Supervisor of Delvin L. Baldwin], Ex. (25), [ "Notice for Selection into Testing Designated Position"], and Ex (24),[" Notice of Selection for Random Drug Testing"]; Unequivocally enunciated a mandatory course of action the Agency Employees were consistently instructed to pursue; neither regulatory

18

policy provided a scintilla of discretionary authority to remove Plaintiff from Federal Service prior to mandatorily directing the Undersigned to seek counseling from the EAP for rehabilitation, for a *"first-time"* drug use offense.

74. Also, reiterating § (III) par. (s) (25) & (26) of this complaint; The mandatory guidelines in SAMHSA, specifically listed quantitative levels more or equal to 15,000 ng/ml required Plaintiff to present a "valid prescription". Plaintiff quantitative level of (3016 ng/ml) and schedule Class III, pursuant to H.H.S. mandatory criteria for positive reporting, did not require Baldwin to present a legitimate medical explanation or a valid prescription for the microscopic level of (Tylenol 3) detected in his system during a random drug test.

75. Contrary to the Agency actions here, if the Federal Employees had no rightful option but to adhere to the directive established by a federal statute, regulation, or policy, as is the case, then there is no discretion in conduct for the discretionary function exception to protect", *See* Berkovitz, 486 U.S. at 536.

76. Here, the Agency duty of care owed to the Claimant; upon an initial or first confirm positive test for illegal drug use, mandates counseling and rehabilitation; by removing Claimant from Federal Service for said offense without following the Agency own mandatory guidelines, violated an Agency directive, as a result DLA and the Tortfeasor's Federal contractor Abbot eScreen, breached its duty of care owed to the Claimant, thus is liable for Baldwin's devastating economic injury, and his inability to obtain future federal employment.

77. If Defendant actions here, the malicious and unjust removal of a preference eligible Veteran, and career Federal Employee, iniquitously label by a Federal Agency, as an "illegal drug user" are left without judicial enquiry, will essentially "undo" decades of historical jurisprudence, with respect to the Civil Service Reform Act of 1978, enacted "by the 95th Congress in-part to protect

employees like the Plaintiff from unfair or unwarranted practices, *See*

https://www.congress.gov/bill/95th-congress/senate-bill/2640

## VI.  Prayer for Relief

WHEREFORE, Delvin L. Baldwin prays that this Court.

a.  Enter judgment against the "Defense Logistics Agency" for Breaching its Duty of Care owed to Plaintiff

b.  Enter judgment directing the Defendant to remove illegal drug use, and any other derogatory information affixed upon Baldwin's Standard Form 50",

c.  Enter judgment directing Defendant to reinstate Plaintiff's employment with the Civil Service to include ($102, 000.00) in backpay.

d.  Enter judgement against Defense Logistics Agency for Intentional infliction of emotional distress

e.  Order Defendant to pay ($ 200,000.00) in Compensatory Damages, and any other money damages the Court deems appropriate.

Delvin L. Baldwin
(Pro-Se) Plaintiff
904 Broad Meadows Blvd.
Unit 406
Virginia Beach, Va. 23462
(757)274-8570

## CERTIFICATE OF SERVICE

This is to certify on August 20, 2021, a copy of this brief was served indicated below:


DEPARTMENT OF THE ARMY
U.S. Army Claims Service
Office of the Judge Advocate General
4411 Llewellyn Avenue, Suite 5360
Fort George G. Meade, Maryland 20755-5125


Fernando Galindo, Clerk of Court
United States District Court
For the Eastern District of Virginia
Walter E Hoffman United States Court House
600 Granby Street, Norfolk Virginia, 23510-1915